**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF IOWA**

| | |
|---|---|
| MELISSA ALVAREZ, *on behalf of herself and all others similarly situated*,<br><br>Plaintiff,<br><br>v.<br><br>OPENLOOP HEALTH, INC.,<br><br>Defendant. | Case No. 4:26-cv-83<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Melissa Alvarez, individually and on behalf of all others similarly situated, by and through undersigned counsel, alleges, upon personal knowledge as to her own acts and experiences and, where indicated, upon information and good faith belief, against OpenLoop Health, Inc. ("OpenLoop" or "Defendant") the following.

## NATURE OF THE ACTION

1. Defendant is a digital health infrastructure company headquartered in Des Moines, Iowa that provides white-label telehealth support services, including provider staffing, clinical operations, technology platforms, and practice management, to healthcare organizations, digital health companies, retailers, and employers nationwide.

2. As part of its operations, Defendant collects, maintains, and stores highly sensitive personal information belonging to individuals who receive care through Defendant's network of licensed clinicians and partner platforms, including personally identifiable information ("PII") and protected health information ("PHI"), including names, addresses, dates of birth, phone numbers, email addresses, Social Security numbers, health insurance information, medical diagnoses,

prescription information, treatment records, body measurements, IP addresses, and other health and medical records (collectively, the "Sensitive Information").

3. In or around January 2026, a threat actor operating under the alias "stuckin2019" posted on a cybercrime forum that it had successfully exfiltrated data from Defendant's systems, claiming to possess over 1.6 million records containing personal and medical information of customers of Defendant's partner platforms (the "Data Breach").[1] That information is already in the hands of cybercriminals and on information and belief is or imminently will be available on the black market.

4. Despite the threat actor's public announcement of the breach and clear evidence that the data of Defendant's partners' customers was compromised, Defendant has failed to notify affected individuals, including Plaintiff, leaving them unaware that their most sensitive personal and medical information is in the hands of cybercriminals.

5. Upon information and belief, Plaintiff and Class Members' PHI and PII—which they entrusted to Defendant on the mutual understanding that Defendant would protect against disclosure—was targeted, compromised, and unlawfully accessed due to the Data Breach.

6. Healthcare providers and digital health companies that handle Sensitive Information have an obligation to employ reasonable and necessary data security practices to protect the sensitive, confidential, and personal information entrusted to them.

7. This duty exists because it is foreseeable that the exposure of such Sensitive Information to unauthorized persons—and especially threat actors known to sell or publicly release

---

[1] Dark Web Informer (@DarkWebInformer), Post on X (formerly Twitter) (Jan. 2026), https://x.com/DarkWebInformer/status/2009284913506161002; *see also OpenLoop Health Data Breach Allegedly Exposes 1.6M Patient Records*, DataBreach.io (Jan. 8, 2026), https://databreach.io/breaches/openloop-health-data-breach-allegedly-exposes-1-6m-patient-records/

stolen data—will result in harm to the affected individuals, including, but not limited to, medical and financial identity theft, invasion of their private health matters and other long-term issues.

8. The harm resulting from a data breach is particularly severe when, as here, the responsible parties fail to notify affected individuals, depriving them of the opportunity to take protective measures, and when cybercriminals publicly advertise possession of the stolen data.

9. Mitigating the risk from this breach requires individuals to devote significant time, money and other resources to closely monitor their credit, financial accounts, health records and email accounts, as well as to take a number of additional prophylactic measures—steps that are made more urgent by Defendant's failure to provide notification.

10. In this instance, all of that could have been avoided if Defendant had employed reasonable and appropriate data security measures and fulfilled its duty to promptly notify affected individuals.

11. As a result of the Data Breach and Defendant's failure to notify, Plaintiff and Class Members are, and continue to be, at significant risk of identity theft and various other forms of personal, social, medical and financial harm. The risk will remain for their respective lifetimes.

12. As such, Plaintiff and Class Members bring this action to recover for the harm they suffered and assert the following claims: (i) Negligence, (ii) Invasion of Privacy, (iii) Breach of Implied Contract, (iv) Unjust Enrichment, and (v) Breach of Fiduciary Duty.

## PARTIES

13. Plaintiff Melissa Alvarez is a natural person and citizen of Texas, residing in San Antonio, Texas.

14. Defendant Openloop Health, Inc. is organized as a corporation under the laws of the State of Delaware and operates a digital health infrastructure business providing white-label

telehealth support services, including clinical staffing, technology platforms, and practice management to healthcare organizations nationwide, with its principal place of business located at 317 6th Ave #400, Des Moines, Iowa 50309.

## JURISDICTION AND VENUE

15. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1332(d)(2) ("CAFA") because: (i) the proposed Class consists of more than 100 members; (ii) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs; and (iii) at least one member of the proposed Class is a citizen of a state different from that of Defendant.

16. This Court has personal jurisdiction over Defendant because Defendant is headquartered in Des Moines, Iowa, within this District, and regularly conducts business in this District.

17. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because Defendant resides in this District, and pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiff's claims occurred in this District, including Defendant's collection, storage, and failure to secure the Sensitive Information at issue.

## COMMON FACTUAL ALLEGATIONS

### A. Defendant Collects, Maintains and Stores Sensitive Personal and Medical Information.

18. Defendant operates as a white-label telehealth infrastructure provider, powering virtual care services for numerous healthcare organizations and digital health companies. Through its network of U.S.-licensed clinicians, Defendant provides clinical services, including medical evaluations, prescription management, and treatment oversight, to individuals who access care through Defendant's partner platforms.

19. Among Defendant's partners is MEDVi ("MEDVi"), a telehealth platform specializing in GLP-1 medication programs for weight loss. As stated on MEDVi's own website: "OpenLoop Health, a network of US-licensed doctors that adhere to rigorous medical protocols designed for patient safety, has established exclusionary criteria to determine if an individual does not qualify for GLP-1s. The answers an individual provides to the MEDVi assessment consequently determine if the individual is screened out of eligibility for GLP-1 medication, and an OpenLoop Health clinician will meet with an individual after checkout to determine if they qualify for a prescription."[2]

20. In the course of providing telehealth services through its partner platforms, Defendant demands, requests, receives, maintains, and stores large volumes of sensitive personal health information and personally identifiable information from the individuals it serves.

21. Specifically, to receive healthcare services facilitated by Defendant, individuals are required to provide their PHI and PII, including but not limited to full names, addresses, dates of birth, email addresses, phone numbers, IP addresses, clinical diagnoses/conditions, prescription information, body measurements, health indicators, delivery and shipment tracking details, and other medical information.

22. By collecting and storing this information, Defendant assumes a duty to securely maintain and protect the PHI and PII of individuals whose data it collects and stores.

23. The PHI and PII that Defendant maintains are highly sensitive and valuable, making them a particularly attractive target for cybercriminals seeking to obtain and misuse or sell the data of Defendant's partners' customers.

---

2 https://glp.medvi.org/terms-and-conditions.html

24. Defendant acknowledges through its privacy policies and communications with individuals and partner organizations its obligation to protect the information of individuals served through its partner platforms and comply with applicable privacy laws and regulations, including HIPAA.

25. Plaintiff and Class Members relied on Defendant to implement and maintain reasonable and adequate security measures to keep their PHI and PII secure and protected from unauthorized access.

**B. The Data Breach.**

26. Defendant derives a substantial economic benefit from providing telehealth infrastructure and clinical services to individuals through its partner platforms, and as a part of providing those services, Defendant retains and stores Plaintiff's and Class Members' Sensitive Information.

27. By obtaining, collecting, and storing the Sensitive Information of Plaintiff and Class Members, Defendant assumed legal and equitable duties and knew or should have known it was responsible for protecting the Sensitive Information from disclosure.

28. Upon information and belief, Defendant made promises to Plaintiff and Class Members to maintain and protect Plaintiff's and Class Members' Sensitive Information, demonstrating an understanding of the importance of securing Sensitive Information.

29. In or around January 2026, a threat actor using the alias "stuckin2019" announced on a cybercrime forum that it had successfully exfiltrated data from Defendant's systems, claiming

to possess records of more than 1,600,000 individuals who received services through Defendant's partner platforms in the United States.[3]

30. According to the forum posting and cybersecurity researchers who reviewed the listing, the compromised data includes personal identifiers such as full names, email addresses, phone numbers, physical addresses, and dates of birth, as well as IP addresses, prescription-related information, delivery tracking details, and medical attributes such as body measurements and other health indicators. Multiple data samples were shared by the seller, suggesting access to non-public medical records rather than publicly available information.

31. Defendant could have prevented this Data Breach by properly securing and encrypting the files and file servers containing the Sensitive Information of Plaintiff and Class Members.

32. Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information it was maintaining for Plaintiff and Class Members, causing the exposure of Sensitive Information, such as encrypting the information or deleting it when it is no longer needed.

33. Upon information and belief, as a result, criminal actors accessed and stole files containing unencrypted Sensitive Information of Plaintiff and Class Members, which the threat actor "stuckin2019" now threatens to publicly release or sell on the dark web.

**C. Defendant Knew or Should Have Known of the Risk of Storing Sensitive Information & Potential Harm to Victims.**

34. Defendant was well aware that the Sensitive Information it collects is highly sensitive and of significant value to those who would use it for wrongful purposes.

---

[3] *Id.*

35. Defendant also knew that a breach of its systems—and exposure of the information stored therein—would result in the increased risk of identity theft and fraud (financial and medical) against the individuals whose Sensitive Information was compromised, as well as intrusion into their highly private health information.

36. These risks are not merely theoretical; in recent years, numerous high-profile data breaches have occurred at businesses such as Equifax, Facebook, Yahoo, Marriott, Anthem as well as countless ones in the healthcare industry.

37. PII has considerable value and constitutes an enticing and well-known target to hackers, who can easily sell stolen data as there has been a "proliferation of open and anonymous cybercrime forums on the Dark Web that serve as a bustling marketplace for such commerce."[4]

38. PHI, in addition to being of a highly personal and private nature, can be used for medical fraud and to submit false medical claims for reimbursement.[5]

39. The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities.

40. In 2021 alone, there were 4,145 publicly disclosed data breaches, exposing 22 billion records. The United States specifically saw a 10% increase in the total number of data breaches.[6]

---

[4] Brian Krebs, *The Value of a Hacked Company*, Krebs on Security (July 14, 2016), http://krebsonsecurity.com/2016/07/the-value-of-a-hacked-company/.

[5] *See* Brian O'Connor, *Healthcare Data Breach: What to Know About them and What to Do After One*, Experian (June 14, 2018), https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-to-know-about-them-and-what-to-do-after-one/.

[6] *Data Breach Report: 2021 Year End*, Risk Based Security (Feb. 4, 2022), https://go.flashpoint-intel.com/docs/2021-Year-End-Report-data-breach-quickview.

41. In tandem with the increase in data breaches, the rate of identity theft complaints has also increased over the past few years; for instance, in 2017, 2.9 million people reported some form of identity fraud compared to 5.7 million people in 2021.[7]

42. The healthcare industry has become a prime target for threat actors: "High demand for patient information and often-outdated systems are among the nine reasons healthcare is now the biggest target for online attacks."[8]

43. Additionally, healthcare providers "store an incredible amount of patient data. Confidential data that's worth a lot of money to hackers who can sell it quickly – making the industry a growing target."[9]

44. Indeed, cybercriminals seek out PHI at a greater rate than other sources of personal information. In a 2022 report, the healthcare compliance company Protenus found that there were 905 medical data breaches in 2021, leaving over 50 million patient records exposed for 700 of the 2021 incidents. This is an increase from the 758 medical data breaches that Protenus compiled in 2020.[10]

45. The healthcare sector suffered about 337 breaches in the first half of 2022 alone according to Fortified Health Security's mid-year report released in July. The percentage of

---

[7] *Insurance Information Institute, Facts + Statistics: Identity theft and cybercrime*, Insurance Information Institute, https://www.iii.org/fact-statistic/facts-statistics-identity-theft-and-cybercrime.

[8] *The healthcare industry is at risk*, https://swivelsecure.com/solutions/healthcare/healthcare-is-the-biggest-target-for-cyberattacks/.

[9] *Id.*

[10] *2022 Breach Barometer*, https://www.protenus.com/breach-barometer-report.

healthcare breaches attributed to malicious activity rose more than 5 percentage points in the first six months of 2022 to account for nearly 80 percent of all reported incidents.[11]

46. The breadth of data that was, upon information and belief, compromised in the Data Breach makes the information particularly valuable to thieves and leaves individuals whose data Defendant stored especially vulnerable to identity theft, tax fraud, medical fraud, credit and bank fraud and more.

47. As indicated by Jim Trainor, former second in command at the FBI's cyber security division: "[m]edical records are a gold mine for criminals—they can access a patient's name, DOB, Social Security and insurance numbers, and even financial information all in one place. Credit cards can be, say, five dollars or more where PHI records can go from $20 say up to—we've even seen $60 or $70."[12]

48. A complete identity theft kit that includes health insurance credentials may be worth up to $1,000 on the black market whereas stolen payment card information sells for about $1.[13]

49. Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity or to otherwise harass or track the victim. For example, armed with just a name and date of birth, a

---

[11] Jill McKeon, *Health Sector Suffered 337 Healthcare Data Breaches in First Half of Year*, Cybersecurity News (July 19, 2022), https://healthitsecurity.com/news/health-sector-suffered-337-healthcare-data-breaches-in-first-half-of-year.

[12] *You Got It, They Want It: Criminals Targeting Your Private Healthcare Data*, IDX (May 14, 2015), https://www.idexpertscorp.com/knowledge-center/single/you-got-it-they-want-it-criminals-are-targeting-your-private-healthcare-dat.

[13] *Managing cyber risks in an interconnected world, Key findings from The Global State of Information Security Survey 2015*, https://www.pwc.com/gx/en/consulting-services/information-security-survey/assets/the-global-state-of-information-security-survey-2015.pdf.

data thief can utilize a hacking technique referred to as "social engineering" to obtain even more information about a victim's identity, such as a person's login credentials or Social Security number. Social engineering is a form of hacking whereby a data thief uses previously acquired information to manipulate individuals into disclosing additional confidential or personal information through means such as spam phone calls and text messages or phishing emails.

50. In fact, as technology advances, computer programs may scan the Internet with a wider scope to create a mosaic of information that may be used to link compromised information to an individual in ways that were not previously possible. This is known as the "mosaic effect." Names and dates of birth, combined with contact information like telephone numbers and email addresses, are very valuable to hackers and identity thieves as it allows them to access users' other accounts.

51. Thus, even if certain information was not purportedly involved in the Data Breach, the unauthorized parties could use Plaintiff's and Class Members' Sensitive Information to access accounts, including, but not limited to, email accounts and financial accounts, to engage in a wide variety of fraudulent activity against Plaintiff and Class Members.

52. For these reasons, the FTC recommends that identity theft victims take several time-consuming steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert on their account (and an extended fraud alert that lasts for 7 years if someone steals the victim's identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a

freeze on their credit, and correcting their credit reports.[14] However, these steps do not guarantee protection from identity theft but can only mitigate identity theft's long-lasting negative impacts.

53. Identity thieves can also use stolen personal information such as Social Security numbers and PHI for a variety of crimes, including medical identity theft, credit card fraud, phone or utilities fraud, bank fraud, to obtain a driver's license or official identification card in the victim's name but with the thief's picture, to obtain government benefits, or to file a fraudulent tax return using the victim's information.

54. For example, Social Security numbers are among the worst kind of Sensitive Information to have been stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of an individual's Social Security number can lead to identity theft and extensive financial fraud.[15]

55. What's more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

56. Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[16]

---

[14] *See* https://www.identitytheft.gov/Steps.

[15] *Identity Theft and Your Social Security Number*, https://www.ssa.gov/pubs/EN-05-10064.pdf.

[16] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back* (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-

57. There may be a substantial time lag between when harm occurs and when it is discovered, and also between when PII and/or PHI is stolen and when it is misused.

58. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches: "[I]n some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data has been sold or posted on the [Dark] Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm."[17]

59. Even if stolen PII or PHI does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Freshly stolen information can be used with success against victims in specifically targeted efforts to commit identity theft known as social engineering or spear phishing. In these forms of attack, the criminal uses the previously obtained PII and PHI about the individual, such as name, address, email address, and affiliations, to gain trust and increase the likelihood that a victim will be deceived into providing the criminal with additional information.

60. Based on the value of the PII and PHI it stored to cybercriminals, Defendant certainly knew the foreseeable risk of failing to implement adequate cybersecurity measures.

**D. The Data Breach Was Preventable.**

62. Given that Defendant was storing the Sensitive Information of Plaintiff and Class Members and knew or should have known of the serious risk and harm caused by a data breach,

---

millionsworrying-about-identity-theft.

[17] *Report to Congressional Requesters, Personal Information* (June 2007), https://www.gao.gov/new.items/d07737.pdf.

Defendant was obligated to implement reasonable measures to prevent and detect cyber-attacks, such as those recommended by the Federal Trade Commission (the "FTC"), required by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), and promoted by data security experts and other agencies.

63. That obligation stems from the foreseeable risk of a data breach given that Defendant collected, stored, and had access to a swath of highly sensitive medical records and personal data and, additionally, because other highly publicized data breaches at numerous healthcare institutions and telehealth companies put Defendant on notice that the personal and sensitive data it stores might be targeted by cybercriminals.

64. Indeed, cyberattacks on medical systems and healthcare companies like Defendant have become so notorious that the Federal Bureau of Investigation and United States Secret Service have issued a warning to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive…because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[18]

65. In fact, according to the cybersecurity firm Mimecast, 90% of healthcare organizations experienced cyberattacks in recent years.[19]

66. Therefore, the increase in such attacks, and the attendant risk of future attacks, was widely known to the public and therefore to anyone in Defendant's industry, including Defendant.

---

[18] Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, Law360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomeware.

[19] *See* Maria Henriquez, *Iowa City Hospital Suffers Phishing Attack*, Security Magazine (Nov. 23, 2020), https://www.securitymagazine.com/articles/93988-iowa-city-hospital-suffers-phishing-attack.

67. Despite the abundance and availability of information regarding cybersecurity best practices for the healthcare industry and the prevalence of healthcare data breaches, Defendant inexplicably failed to adopt sufficient data security process by, without limitation:

a. Failing to properly select its information security partners;

b. Failing to ensure the proper monitoring and logging of the ingress and egress of network traffic;

c. Failing to ensure the proper monitoring and logging of file access and modifications;

d. Failing to ensure the proper training of its technology partners' employees as to cybersecurity best practices;

e. Failing to ensure fair, reasonable, or adequate computer systems and data security practices to safeguard the PII and PHI of Plaintiff and Class Members;

f. Knowingly disregarding standard information security principles, despite obvious risks, by allowing unmonitored and unrestricted access to unsecured PII and PHI; and

g. Failing to provide adequate supervision and oversight of the PII and PHI with which it was and is entrusted, in spite of the known risk and foreseeable likelihood of breach and misuse, which permitted an unknown third party to gather PII and PHI of Plaintiff and Class Members, misuse the PHI/PII and potentially disclose it to others without consent.

68. Upon information and belief, Defendant further failed to ensure the proper implementation of sufficient processes to quickly detect and respond to data security incidents, to ensure the proper encryption of Plaintiff's and Class Members' Sensitive Information, and to monitor user behavior and activity to identify possible threats.

69. Time is of the essence when highly sensitive PII and PHI is subject to unauthorized access and/or acquisition.

70. Plaintiff and Class Members are now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from the unauthorized access of their PHI and PII.

71. Plaintiff and Class Members now face a lifetime risk of identity theft, which is heightened here by unauthorized access, disclosure, and/or activity by cybercriminals on computer systems containing sensitive personal information.

72. Despite the highly sensitive nature of the information that Defendant obtained, maintained, and stored and the prevalence of healthcare data breaches, Defendant inexplicably failed to take appropriate steps to safeguard the Sensitive Information of Plaintiff and Class Members from being compromised.

73. The Data Breach itself, and information Defendant has disclosed about the breach to date, demonstrate Defendant failed to implement reasonable measures to prevent cyber-attacks and exposure of the Sensitive Information it oversaw.

**E. Defendant Failed to Comply with FTC Guidelines.**

74. The FTC recognizes that consumer data is a lucrative (and valuable) form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour underscored this point by reiterating that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency."[20]

75. The FTC has promulgated numerous guides for businesses that highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

76. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cyber-security guidelines for business.

---

[20] Pamela Jones Harbour, *Remarks Before FTC Exploring Privacy Roundtable* (Dec. 7, 2009), https://www.ftc.gov/news-events/news/speeches/remarks-ftc-exploring-privacy-roundtable.

77. Those guidelines note that businesses should protect the personal customer information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[21]

78. The FTC further recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[22]

79. The FTC has also issued, and regularly updates, guidelines for businesses to implement reasonable data security practices and incorporate security into all areas of the business.

80. According to the FTC, reasonable data security protocols require:

a. Encrypting the information stored on computer networks;

b. Retaining payment card information only as long as necessary;

c. Properly disposing of personal information that is no longer needed or can be disposed pursuant to relevant state and federal laws;

d. Limiting administrative access to business systems;

e. Using industry-tested methods for security;

f. Monitoring activity on networks to uncover unapproved activity;

g. Verifying that privacy and security features function properly;

h. Testing for common vulnerabilities; and

---

[21] *Protecting Personal Information: A Guide for Business* (2016), https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business.

[22] *Start with Security: A Guide for Business* (2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

i. Updating and patching third-party software.[23]

81. The FTC cautions businesses that failure to protect Sensitive Information and the resulting data breaches can destroy consumers' finances, credit history, and reputations, and can take time, money, and patience to resolve the effect.[24] Indeed, the FTC treats the failure to implement reasonable and adequate data security measures—like Defendant failed to do here—as an unfair act prohibited by Section 5(a) of the FTC Act.

82. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect consumer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45.

83. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

84. These FTC enforcement actions include actions against healthcare providers and partners like Defendant.

85. Defendant failed to properly implement basic data security practices.

86. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to customer's Sensitive Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

---

[23] *Id.*

[24] *See Taking Charge, What to Do if Your Identity is Stolen*, at 3 (Jan. 2012), https://www.ojp.gov/ncjrs/virtual-library/abstracts/taking-charge-what-do-if-your-identity-stolen.

87. On information and good faith belief Plaintiff alleges that Defendant was at all times fully aware of the obligation to protect the Sensitive Information of individuals whose data it collected and stored. Defendant was also aware of the significant repercussions that would result from its failure to do so.

**F. Defendant Failed to Comply with Industry Standards.**

88. As shown above, experts studying cybersecurity routinely identify healthcare providers and digital health companies as being particularly vulnerable to cyberattacks because of the value of the Sensitive Information which they collect and maintain.

89. Several best practices have been identified that at a minimum should be implemented by healthcare providers and digital health infrastructure companies like Defendant, including but not limited to educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; and limiting which employees can access sensitive data.

90. The United States Government and the United States Cybersecurity & Infrastructure Agency recommend several similar and supplemental measures to prevent and detect cyberattacks, including, but not limited to: implement an awareness and training program, enabling strong spam filters, scanning incoming and outgoing emails, configuring firewalls, automating anti-virus and anti-malware programs, managing privileged accounts, configuring access controls, disabling remote desktop protocol, and updating and patching computers.

91. Other best cybersecurity practices that are standard in the healthcare industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such

as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points.

92. Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1[25] (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet's Critical Security Controls[26] (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

93. The FBI's Internet Crime Complaint Center (IC3) 2019 estimated that there was more than $3.5 billion in losses to individual and business victims due to identity fraud in that year alone. That same report identified "rapid reporting" as a tool to help law enforcement stop fraudulent transactions and mitigate losses.

94. These foregoing frameworks are existing and applicable industry standards in the healthcare industry, and Defendant failed to comply with these accepted standards, thereby opening the door to the cyber incident and causing the Data Breach.

**G. Defendant's Conduct and Insufficient Data Security Violate HIPAA.**

95. The Health Insurance Portability and Accountability Act of 1996 requires covered entities to protect against reasonably anticipated threats to the security of sensitive patient health information.

---

[25] Nat'l Inst. of Standards & Tech., *Framework for Improving Critical Infrastructure Cybersecurity* (2018), https://nvlpubs.nist.gov/nistpubs/cswp/nist.cswp.04162018.pdf.

[26] *See The 18 CIS Critical Security Controls*, https://www.cisecurity.org/controls/cis-controls-list.

96. Covered entities must implement safeguards to ensure the confidentiality and availability of PII and PHI. Safeguards must include physical, technical, and administrative components.[27]

97. Title II of HIPAA contains what are known as the Administrative Simplification provisions.[28] These provisions require, among other things, that the Department of Health and Human Services ("HHS") creates rules to streamline the standards for handling PII and PHI, like the data Defendant left unguarded.

98. HHS subsequently promulgated multiple regulations under the authority of the Administrative Simplification provisions of HIPAA. These rules include 45 C.F.R. §164.306(a)(1)-(4); 45 C.F.R. §164.308(1)(i); 45 C.F.R. §164.308(a)(1)(ii)(D), and 45 C.F.R. §164.530(b).

99. A data breach, such as the one Defendant experienced, is considered a breach under the HIPAA rules because there is an access of PHI not permitted under the HIPAA Privacy Rule. A breach under the HIPAA Rules is defined as, "the acquisition, access, use, or disclosure of PHI in a manner not permitted under [the HIPAA Privacy Rule] which compromises the privacy of the PHI."[29]

100. The Data Breach resulted from a combination of insufficiencies that Defendant failed to comply with safeguards maintained by HIPAA regulations.

---

[27] *See* 45 C.F.R. § 164.306 (security standards and general rules); 45 C.F.R. § 164.308 (administrative safeguards); 45 C.F.R § 164.310 (physical safeguards); 45 C.F.R. § 164.312 (technical safeguards).

[28] 42 U.S.C. § 1301, *et seq.*

[29] *See* C.F.R. § 164.40.

101. Furthermore, persons, including healthcare providers and their business associates, that receive information from a confidential communication or record, as described above, "may not disclose the information except to the extent that disclosure is consistent with the authorized purposes for which the information was first obtained."[30]

102. Defendant's Data Breach and unauthorized disclosure of Plaintiff's and Class Members' Sensitive Information to malicious third parties violated Plaintiff's and Class Members' rights to privacy and confidentiality in their receipt of healthcare services and fell below the applicable standards for safeguarding the confidential Sensitive Information of Plaintiff and Class Members.

### H. The Data Breach Resulted from Defendant's Failure to Properly Maintain and Safeguard Its Systems and Data

103. Defendant breached its obligations to Plaintiff and Class Members and/or was otherwise negligent and reckless because it failed to properly maintain and safeguard its computer systems and data.

104. Defendant's unlawful conduct includes, but is not limited to, the following acts and/or omissions:

a. Failing to maintain an adequate data security system to reduce the risk of data breaches and cyber-attacks;

b. Failing to adequately protect Plaintiff's and Class Members' Sensitive Information;

c. Failing to properly monitor its own data security systems for existing intrusions;

d. Failing to ensure that its vendors with access to its computer systems employed reasonable security procedures;

e. Failing to detect unauthorized ingress into its systems;

[30] *Id.* § 159.002(c).

f. Failing to implement and monitor reasonable network segmentation to detect unauthorized travel within its systems, including to and from areas containing the most sensitive data;

g. Failing to detect unauthorized exfiltration of the most sensitive data on its system;

h. Failing to train its employees in the proper handling of emails containing Sensitive Information and maintain adequate email security practices;

i. Failing to ensure the confidentiality and integrity of electronic PHI it created, received, maintained, and/or transmitted, in violation of 45 C.F.R. §164.306(a)(1);

j. Failing to implement technical policies and procedures for electronic information systems that maintain electronic PHI to allow access only to those persons or software programs that have been granted access rights in violation of 45 C.F.R. §164.312(a)(1);

k. Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. §164.308(a)(1)(i);

l. Failing to implement procedures to review records of information system activity regularly, such as audit logs, access reports, and security incident tracking reports in violation of 45 C.F.R. §164.308(a)(1)(ii)(D);

m. Failing to protect against reasonably anticipated uses or disclosures of electronic PHI that are not permitted under the privacy rules regarding individually identifiable health information in violation of 45 C.F.R. §164.306(a)(3);

n. Failing to ensure compliance with HIPAA security standard rules by its workforce in violation of 45 C.F.R. §164.306(a)(4);

o. Failing to train all members of its workforce effectively on the policies and procedures regarding PHI as necessary and appropriate for the members of its workforces to carry out its functions and to maintain security of PHI, in violation of 45 C.F.R. §164.530(b);

p. Failing to render the electronic PHI it maintained unusable, unreadable, or indecipherable to unauthorized individuals, as it had not encrypted the electronic PHI as specified in the HIPAA Security Rule by "the use of an algorithmic process to transform data into a form in which there is a low probability of assigning meaning without the use of a confidential process or key"[31];

q. Failing to comply with FTC guidelines for cybersecurity, in violation of Section 5 of the FTC Act, and

---

[31] 45 C.F.R. §164.304.

r. Otherwise breaching its duties and obligations to protect Plaintiff's and Class Members' Sensitive Information.

105. Defendant negligently and unlawfully failed to safeguard Plaintiff's and Class Members' Sensitive Information. Accordingly, as outlined below, Plaintiff and Class Members now face actual fraud and identity theft as well as increased risk of fraud and identity theft. In addition, Plaintiff and Class Members lost the benefit of the bargain they made with Defendant.

## I. Cyberattacks and Data Breaches Cause Disruption and Put Victims at an Increased Risk of Fraud and Identity Theft.

106. Cyberattacks and data breaches at healthcare companies like Defendant are especially problematic because they can negatively impact the overall daily lives of individuals affected by the attack.

107. Researchers have found that among medical services providers that experience a data security incident, the death rate among patients increased in the months and years after the attack.[32]

108. Researchers have further found that at medical service providers that experienced a data security incident, the incident was associated with deterioration in timeliness and patient outcomes, generally.[33]

---

[32] *See* Nsikan Akpan, *Ransomware and Data Breaches Linked to Uptick in Fatal Heart Attacks*, PBS (Oct. 24, 2019), https://www.pbs.org/newshour/science/ransomeware-and-other-data-breaches-linked-to-uptick-in-fatal-heart-attacks.

[33] *See* Sung J. Choi *et al.*, *Data Breach Remediation Efforts and Their Implications for Hospital Quality*, 54 Health Services Res. 971, 971-80 (2019), https://www.onlinelibrary.wiley.com/doi/full/10.1111/1475-6773.13203.

109. The United States Government Accountability Office released a report in 2007 regarding data breaches in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[34]

110. That is because any victim of a data breach is exposed to serious ramifications regardless of the nature of the data. Indeed, the reason criminals steal personally identifiable information is to monetize it.

111. They do this by selling the spoils of their cyberattacks on the black market to identity thieves who desire to extort and harass victims, take over victims' identities in order to engage in illegal financial transactions under the victims' names. Because a person's identity is akin to a puzzle, the more accurate pieces of data an identity thief obtains about a person, the easier it is for the thief to take on the victim's identity, or otherwise harass or track the victim.

112. The FTC recommends that identity theft victims take several steps to protect their personal and financial information after a data breach, including contacting one of the credit bureaus to place a fraud alert (and consider an extended fraud alert that lasts for 7 years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[35]

113. Identity thieves use stolen personal information such as Social Security numbers for a variety of crimes, including credit card fraud, phone or utilities fraud, and bank/finance fraud.

---

[34] *See* GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown, at 2 (2007), https://www.gao.gov/new.items/d07737.pdf.

[35] *See IdentityTheft.gov*, https://www.identitytheft.gov/steps.

114. Identity thieves can also use Social Security numbers to obtain a driver's license or official identification card in the victim's name but with the thief's picture; use the victim's name and Social Security number to obtain government benefits; or file a fraudulent tax return using the victim's information.

115. In addition, thieves may obtain a job using the victim's Social Security Number, rent a house or receive medical services in the victim's name, and may even give the victim's personal information to police during an arrest resulting in an arrest warrant issued in the victim's name.

116. Moreover, theft of PII is also gravely serious because PII is an extremely valuable property right.[36]

117. Its value is axiomatic, considering the value of "big data" in corporate America and the fact that the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Sensitive Information has considerable market value.

118. Theft of PHI, in particular, is gravely serious. A thief may use customers' and patients' name or health insurance numbers "to see a doctor, get prescription drugs, buy medical devices, submit claims with [an] insurance provider, or get other medical care. If the thief's health information is mixed with yours, it could affect the medical care you're able to get or the health insurance benefits you're able to use. It could also hurt your credit."[37]

---

[36] See, e.g., John T. Soma et al., Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich J.L. & Tech. 11, at 3-4 (2009).

[37] *What to Know About Medical Identity Theft*, https://www.ftc.gov/articles/what-know-about-medical-identity-theft.

119. There may additionally be a substantial time lag—measured in years—between when harm occurs and when it is discovered, and also between when Sensitive Information and/or financial information is stolen and when it is used.

120. Sensitive Information is such a valuable commodity to identity thieves that once the information has been compromised, criminals often trade the information on the "cyber black-market" for years.

121. There is a strong probability that entire batches of stolen information have been dumped on the black market and are yet to be dumped on the black market, meaning Plaintiff and Class Members are at an increased risk of fraud and identity theft for many years into the future.

122. Plaintiff and Class Members must vigilantly monitor their financial and medical accounts for many years to come.

123. PHI can sell for as much as $363 per record according to the Infosec Institute.[38]

124. PII is particularly valuable because criminals can use it to target victims with frauds and scams. Once PII is stolen, fraudulent use of the information and damage to victims may continue for years.

125. This data, as one would expect, demands a much higher price on the black market. Martin Walter, senior director at the cybersecurity firm RedSeal, explained, "[c]ompared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[39]

---

[38] Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, Infosec (July 27, 2015), https://www.resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market.

[39] Tim Greene, *Anthem hack: Personal Data stolen sells for 10x price of stolen credit card numbers* (Feb 6. 2015), https://www.networkworld.com/article/935334/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

126. Medical information is especially valuable to identity thieves.

127. For this reason, Defendant knew or should have known about these dangers and strengthened its data systems and data security measures accordingly. Defendant was put on notice of the substantial and foreseeable risk of harm from a data breach, yet it failed to properly prepare for that risk.

**J. Plaintiff's and Class Members' Damages.**

128. Upon information and belief, Plaintiff's and Class Members' Sensitive Information was compromised in the Data Breach and is now in the hands of cybercriminals who accessed the data Defendant held within its systems.

129. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members have been placed at a present, imminent, immediate, and continuing increased risk of harm from fraud and identity theft.

130. As a direct and proximate result of Defendant's conduct, Plaintiff and Class Members will be forced to expend time dealing with the effects of the Data Breach, valuable time Plaintiff and Class Members otherwise would have spent on other activities, including but not limited to work and/or recreation.

131. Plaintiff and Class Members face substantial risk of out-of-pocket fraud losses such as loans opened in their names, medical services billed in their names, tax return fraud, utility bills opened in their names, credit card fraud, and similar identity theft.

132. Plaintiff and Class Members face substantial risk of being targeted for future phishing, data intrusion, and other illegal schemes based on their Sensitive Information as potential fraudsters could use that information to more effectively target such schemes to Plaintiff and Class Members.

133. Plaintiff and Class Members may also incur out-of-pocket costs for protective measures such as credit monitoring fees, credit report fees, credit freeze fees, and similar costs directly or indirectly related to the Data Breach.

134. Plaintiff and Class Members also suffered a loss of value of their Sensitive Information when it was likely acquired by cyber thieves in the Data Breach. Numerous courts have recognized the propriety of loss of value damages in related cases.

135. Plaintiff and Class Members were also damaged via benefit-of-the-bargain damages. Plaintiff and Class Members who received care through Defendant's partner platforms overpaid for a service that was intended to be accompanied by adequate data security that complied with industry standards.

136. Part of the price Plaintiff and Class Members paid was intended to be used by Defendant to fund adequate data security practices to safeguard Plaintiff's and Class Members' Sensitive Information. As demonstrated by the Data Breach, Defendant failed to fund and provide adequate data security practices. Thus, Plaintiff and the Class Members did not get what they paid for and agreed to.

137. Plaintiff and Class Members have suffered or will suffer actual injury as a direct result of the Data Breach. Many victims suffered ascertainable losses in the form of out-of-pocket expenses and the value of their time reasonably spent to remedy or mitigate the effects of the Data Breach relating to:

a. Reviewing and monitoring sensitive accounts and finding fraudulent insurance claims, loans, and/or government benefits claims;

b. Purchasing credit monitoring and identity theft prevention;

c. Placing "freezes" and "alerts" with reporting agencies;

d. Spending time on the phone with or at financial institutions, healthcare providers, and/or government agencies to dispute unauthorized and fraudulent activity in their name;

e. Contacting financial institutions and closing or modifying financial accounts; and,

f. Closely reviewing and monitoring their medical insurance accounts, bank accounts, and credit reports, as well as alerts for identity fraud including their SSNs, for unauthorized activity for years to come.

138. Moreover, Plaintiff and Class Members have an interest in ensuring that their Sensitive Information, which is believed to remain in the possession of Defendant, is protected from further breaches by the implementation of security measures and safeguards, including but not limited to, making sure that the storage of data or documents containing Sensitive Information is not accessible online or otherwise to unauthorized third parties.

139. Further, as a result of Defendant's conduct, Plaintiff and Class Members are forced to live with the anxiety that their Sensitive Information—which contains the most intimate details about a person's life, including what ailments they suffer, what medications they take, and their body measurements—may be disclosed to the entire world, thereby subjecting them to embarrassment and depriving them of any right to privacy whatsoever.

140. As a direct and proximate result of Defendant's actions and omissions, Plaintiff and Class Members have suffered anxiety, emotional distress, and loss of privacy, and are at an increased risk of future harm.

## REPRESENTATIVE PLAINTIFF'S EXPERIENCE

141. In 2025, Plaintiff Alvarez sought medical treatment through the telehealth platform MEDVi for the purpose of obtaining GLP-1 medications.

142. MEDVi provides its clinical services through Defendant OpenLoop Health.

143. As a condition of receiving telehealth services and GLP-1 medication prescriptions through MEDVi's platform, Plaintiff was required to provide her sensitive personal and medical information, which was transmitted to and collected, maintained, and stored by Defendant.

144. Plaintiff provided her Sensitive Information with the reasonable expectation that Defendant would protect and secure this information from unauthorized access and disclosure.

145. On information and belief, Plaintiff's Sensitive Information—including her name, date of birth, address, email address, phone number, IP address, medical history, prescription information, body measurements, health indicators, and/or other health and personal data—was improperly accessed or obtained by the threat actor "stuckin2019" when the Data Breach occurred.

146. Plaintiff reasonably expected and understood that Defendant would take, at a minimum, industry standard precautions to protect, maintain, and safeguard her Sensitive Information from unauthorized users or disclosure. Plaintiff would not have used Defendant's services—or the services of Defendant's partner platform MEDVi—had she known that Defendant would not take reasonable steps to safeguard her Sensitive Information.

147. Plaintiff is very careful about sharing her sensitive PII and PHI. She has never knowingly transmitted unencrypted sensitive PII over the internet or any other unsecured source. Furthermore, Plaintiff stores any documents containing her sensitive information in a safe and secure location or destroys the documents. Moreover, she diligently chooses unique usernames and passwords for her various online accounts.

148. As a result of the Data Breach and Defendant's failure to notify, Plaintiff made reasonable efforts to mitigate the impact, including but not limited to researching the Data Breach, reviewing financial statements, monitoring her credit information, implementing credit freezes, and changing passwords on her various accounts.

149. Upon information and belief, Plaintiff Alvarez suffered actual injury from having her sensitive information exposed and/or stolen as a result of the Data Breach including, but not limited to: (a) entrusting PII and PHI to Defendant that she would not have had Defendant disclosed it lacked data security practices adequate to safeguard the Sensitive Information of individuals whose data it stored; (b) damages to and diminution in the value of her Sensitive Information—a form of intangible property that she entrusted to Defendant as a condition of receiving healthcare services; (c) loss of her privacy; (d) continuous imminent and impending injury arising from the increased risk of financial, medical, and identity fraud and theft; and (e) time and expense of her mitigation efforts as a result of the Data Breach.

150. Due to the Data Breach, Plaintiff anticipates spending considerable additional time and money on an ongoing basis to try to mitigate and address harms caused by the breach. This includes ongoing credit monitoring, changing passwords, monitoring her medical history and health insurance information, and monitoring her other accounts for fraudulent activity.

151. Plaintiff has already experienced a significant increase in spam calls and phishing attempts, including pre-recordings and emails asking her to provide her personal financial information.

152. Plaintiff suffered lost time, annoyance, interference, and inconvenience as a result of the Data Breach and has experienced anxiety and increased concerns for the loss of her privacy, as well as anxiety over the impact of cybercriminals publicly posting or selling her PII and PHI.

153. Plaintiff is now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from her PII and PHI being in the possession of the threat actor "stuckin2019" and potentially other unauthorized third parties/criminals.

154. Plaintiff Alvarez has a continuing interest in ensuring that her PII and PHI, which, upon information and belief, remains in Defendant's possession, is protected and safeguarded from future breaches.

## CLASS ACTION ALLEGATIONS

155. Plaintiff brings this action on behalf of herself and all others similarly situated for the Classes defined below.

156. The Nationwide Class that Plaintiff seeks to represent is defined as follows:

> All individuals residing in the United States whose Sensitive Information was compromised by the Data Breach (the "Class").

157. The following people are excluded from the Class: (i) any judge or magistrate presiding over this action and members of their families; (ii) Defendant, Defendant's subsidiaries, parents, successors, predecessors, affiliated entities, and any entity in which Defendant has a controlling interest, and their current or former officers and directors; (iii) Plaintiff's counsel and Defendant's counsel; and (iv) the legal representatives, successors, and assigns of any such excluded persons.

158. **Numerosity**: The exact number of members of the Class is unknown but, upon information and belief, it is estimated to number in the hundreds of thousands or more at this time, given the threat actor's claim to possess over 1.6 million records of Defendant's partners' customers, and individual joinder in this case is impracticable. Members of the Class can be easily identified through Defendant's records and objective criteria permitting self-identification in response to notice, and notice can be provided through techniques similar to those customarily used in other data breach, consumer breach of contract, unlawful trade practices, and class action controversies.

159. **Typicality**: Plaintiff's claims are typical of the claims of other members of the Class in that Plaintiff, and the members of the Class, sustained damages arising out of Defendant's Data Breach, wrongful conduct and misrepresentations, false statements, concealment, and unlawful practices, and Plaintiff and members of the Class sustained similar injuries and damages, as a result of Defendant's uniform illegal conduct.

160. **Adequacy**: Plaintiff will fairly and adequately represent and protect the interests of the Class and has retained counsel competent and experienced in complex class actions to vigorously prosecute this action on behalf of the Class. Plaintiff has no interests that conflict with, or are antagonistic to those of the Class, and Defendant has no defenses unique to Plaintiff.

161. **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiff and the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include, but are not necessarily limited to the following:

a. Whether Defendant violated the laws asserted herein, including statutory privacy laws;

b. Whether Defendant had a duty to use reasonable care to safeguard Plaintiff's and Class Members' Sensitive Information;

c. Whether Defendant breached the duty to use reasonable care to safeguard Plaintiff's and Class Members' Sensitive Information;

d. Whether Defendant breached its contractual promises to safeguard Plaintiff's and Class Members' Sensitive Information;

e. Whether Defendant knew or should have known about the inadequacies of its data security policies and system and the dangers associated with storing Sensitive Information;

f. Whether Defendant failed to use reasonable care and commercially reasonable methods to safeguard and protect Plaintiff's and Class Members' Sensitive Information from unauthorized release and disclosure;

g. Whether the proper data security measures, policies, procedures, and protocols were in place and operational within Defendant's computer systems to safeguard and protect Plaintiff's and Class Members' Sensitive Information from unauthorized release and disclosure;

h. Whether Defendant took reasonable measures to determine the extent of the Data Breach after it was discovered;

i. Whether Defendant's method of informing Plaintiff and other members of the Class was unreasonable;

j. Whether Defendant's conduct was likely to deceive the public;

k. Whether Defendant is liable for negligence or gross negligence;

l. Whether Defendant's conduct, practices, statements, and representations about the Data Breach of the Sensitive Information violated applicable state laws;

m. Whether Plaintiff and Class Members were injured as a proximate cause or result of the Data Breach;

n. Whether Plaintiff and members of the Class were damaged as a proximate cause of the Data Breach;

o. Whether Defendant's practices and representations related to the Data Breach breached implied contracts with Plaintiff and members of the Class;

p. What the proper measure of damages is; and

q. Whether Plaintiff and members of the Class are entitled to restitutionary, injunctive, declaratory, or other relief.

162. **Superiority**: This cause is also appropriate for class certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy as joinder of all parties is impracticable. The damages suffered by the individual members of the Class will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Defendant's actions. Thus, it would be virtually impossible for the individual members of the Class to obtain effective relief from Defendant's misconduct. Even if members of the Class could sustain such individual litigation, it would still not be preferable to a class action, because individual litigation would

increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered, and uniformity of decisions ensured.

163. A class action is superior to individual litigation because:

a. The amount of damages available to an individual plaintiff is insufficient to make litigation addressing Defendant's conduct economically feasible in the absence of the class action procedural device;

b. Individualized litigation would present a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system; and

c. The class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

164. Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a. Whether Defendant owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Sensitive Information;

b. Whether Defendant's security measures to protect its data systems were reasonable in light of best practices recommended by data security experts;

c. Whether Defendant's failure to institute adequate protective security measures amounted to negligence;

d. Whether Defendant failed to take commercially reasonable steps to safeguard consumer Sensitive Information; and

e. Whether adherence to FTC data security recommendations, and measures recommended by data security experts would have reasonably prevented the Data Breach.

165. Finally, all members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the Data Breach.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### NEGLIGENCE
***(On Behalf of Plaintiff & the Class)***

166. Plaintiff re-alleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein. Defendant received the Sensitive Information of Plaintiff and Class Members, through its partner platforms including MEDVi, in order to provide telehealth clinical services.

167. By collecting and storing this data in its computer systems and networks, and sharing it and using it for commercial gain, Defendant owed a duty of care to use reasonable means to secure and safeguard its computer system—and Plaintiff's and Class Members' Sensitive Information held within it—to prevent disclosure of the information, and to safeguard the information from theft. Defendant's duty included a responsibility to implement processes by which it could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

168. Defendant owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, the personnel responsible for them, and its information technology partners adequately protected the Sensitive Information.

169. Plaintiff and the Class are a well-defined, foreseeable, and probable group of individuals that Defendant was aware, or should have been aware, could be injured by inadequate data security measures.

170. A large repository of highly valuable healthcare and personal information is a foreseeable target for cybercriminals looking to steal and profit from that sensitive information. Defendant knew or should have known that, given its repository of a host of Sensitive Information for over 1.6 million individuals, it posed a significant risk of being targeted for a data breach. Thus, Defendant had a duty to reasonably safeguard Plaintiff's and Class Members' data by implementing reasonable data security measures to protect against data breaches.

171. Defendant's duty of care to use reasonable security measures also arose as a result of the special relationship that existed between Defendant and the individuals whose data it collected and maintained, which is recognized by laws and regulations including but not limited to HIPAA, as well as common law. Defendant was in a superior position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class Members from a data breach.

172. Defendant's duty to use reasonable security measures under HIPAA required Defendant to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information."[40] Some or all of the medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

173. In addition, Defendant has a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, which prohibits "unfair…practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.[41]

---

[40] 45 C.F.R. §164.530(c)(1).

[41] *See* 15 U.S.C. §45.

174. Defendant breached its duties, and thus was negligent, by failing to use reasonable measures to protect Plaintiff's and Class Members' Sensitive Information.

175. But for Defendant's wrongful and negligent breach of its duties to Plaintiff and Class Members, their Sensitive Information would not have been compromised, stolen, and viewed by unauthorized persons. Defendant's negligence was a direct and legal cause of the theft of the Sensitive Information of Plaintiff and Class Members and all resulting damages.

176. As a result of this misconduct by Defendant, the Sensitive Information of Plaintiff and Class Members was compromised, placing them at a greater risk of identity theft and of their Sensitive Information being disclosed to third parties without the consent of Plaintiff and the Class.

177. Plaintiff and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

178. Plaintiff and Class Members are also entitled to injunctive relief requiring Defendant to, *e.g.,* (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to Plaintiff and all Class Members.

## SECOND CAUSE OF ACTION

## INVASION OF PRIVACY
***(On Behalf of Plaintiff & the Class)***

179. Plaintiff re-alleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

180. Plaintiff and the Class had a legitimate expectation of privacy regarding their highly sensitive and confidential PII and PHI and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

181. Defendant owed a duty to the individuals whose data it collected and stored, including Plaintiff and the Class, to keep this information confidential.

182. The unauthorized acquisition (i.e., theft) by a third party of Plaintiff and Class Members' PII and PHI is highly offensive to a reasonable person.

183. The intrusion was into a place or thing which was private and entitled to be private. Plaintiff and the Class disclosed their sensitive and confidential information to Defendant as part of receiving healthcare services through Defendant's partner platforms, but they did so privately, with the intention that their information would be kept confidential and protected from unauthorized disclosure.

184. The Data Breach constitutes an interference with Plaintiff's and the Class Members' interest in solitude or seclusion, either as to their person or as to their private affairs or concerns, of a kind that would be highly offensive to a reasonable person.

185. Defendant acted with a knowing state of mind when it permitted the Data Breach because it knew its information security practices were inadequate.

186. As a proximate result of Defendant's acts and omissions, the private and sensitive PII and PHI of Plaintiff and the Class were stolen by a third party and are now available for disclosure and redisclosure without authorization, causing Plaintiff and the Class to suffer damages.

187. Plaintiff and the Class have no adequate remedy at law for the injuries relating to Defendant's continued possession of their sensitive and confidential records. A judgment for monetary damages will not end Defendant's inability to safeguard the PII and PHI of Plaintiff and the Class.

188. In addition to injunctive relief, Plaintiff, on behalf of herself and the other members of the Class, also seeks compensatory damages for Defendant's invasion of privacy.

**THIRD CAUSE OF ACTION**

**BREACH OF IMPLIED CONTRACT**
***(On Behalf of Plaintiff & the Class)***

189. Plaintiff re-alleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

190. Defendant required Plaintiff and Class Members to provide and entrust their Sensitive Information as a condition of obtaining telehealth services facilitated by Defendant.

191. Plaintiff and Class Members paid money, directly and/or indirectly through Defendant's partner platforms such as MEDVi, in exchange for goods and services, as well as Defendant's promise to protect their Sensitive Information from unauthorized disclosure.

192. Defendant promised to comply with legal and industry standards, including HIPAA, and to make sure that Plaintiff's and Class Members' Sensitive Information would remain protected.

193. Implicit in the agreement between Defendant and Plaintiff and Class Members was the obligation that both parties would maintain the Sensitive Information confidentially and securely.

194. Defendant breached the implied contracts with Plaintiff and Class Members by failing to safeguard and protect Plaintiff's and Class Members' Sensitive Information and by violating industry standards as well as legal obligations that are necessarily incorporated into implied contracts between Plaintiff, Class Members, and Defendant.

195. As a direct and proximate result of Defendant's above-described breach of implied contract, Plaintiff and Class Members have suffered (and will continue to suffer) (a) ongoing,

imminent, and impending threat of identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; (b) actual identity theft crimes, fraud, and abuse, resulting in monetary loss and economic harm; (c) loss of the confidentiality of the stolen confidential data; (d) the possibility of an illegal sale of the compromised data on the dark web; (e) lost work time; and (f) other economic and non-economic harm.

196. As a direct and proximate result of Defendant's above-described breach of contract, Plaintiff and Class Members are entitled to recover actual, consequential, and nominal damages.

**FOURTH CAUSE OF ACTION**

**UNJUST ENRICHMENT**
***(On Behalf of Plaintiff & the Class)***

198. Plaintiff re-alleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

199. This claim is pleaded solely in the alternative to Plaintiff's breach of implied contract claim.

200. Plaintiff and Class Members conferred a monetary benefit on Defendant by paying money for healthcare services, directly and/or through Defendant's partner platforms, a portion of which was intended to have been used by Defendant for data security measures to secure Plaintiff and Class Members' Sensitive Information.

201. Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff and Class Members' Sensitive Information. Instead of providing a reasonable level of security that would have prevented the Data Breach, Defendant instead calculated to avoid its data security obligations at the expense of Plaintiff and Class Members.

202. Under the principles of equity and good conscience, Defendant should not be permitted to retain the money belonging to Plaintiff and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

203. Plaintiff and Class Members have no adequate remedy at law.

204. Defendant should be compelled to disgorge into a common fund for the benefit of Plaintiff and Class Members all unlawful or inequitable proceeds it received as a result of its conduct and the Data Breach alleged herein.

**FIFTH CAUSE OF ACTION**

**BREACH OF FIDUCIARY DUTY**
***(On Behalf of Plaintiff & the Class)***

205. Plaintiff re-alleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

206. In light of the special relationship between Defendant and Plaintiff and Class Members, whereby Defendant was guardian of Plaintiff's and Class Members' Sensitive Information, Defendant became a fiduciary by its undertaking and guardianship of the Sensitive Information.

207. Defendant has a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of its relationship with the individuals whose data it collected and stored, to keep secure their Sensitive Information.

208. Defendant breached its fiduciary duties to Plaintiff and Class Members by failing to diligently discover, investigate, and give detailed notice of the Data Breach to Plaintiff and the Class in a reasonable and practicable period of time.

209. Defendant breached its fiduciary duties to Plaintiff and Class Members by failing to encrypt and otherwise protect the integrity of the systems containing Plaintiff's and Class Members' Sensitive Information.

210. As a direct and proximate result of Defendant's breaches of its fiduciary duties, Plaintiff and Class Members have suffered and will suffer injury.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Melissa Alvarez, on behalf of herself and all persons similarly situated, prays for judgment in her favor and against Defendant Openloop Health, Inc. and respectfully requests that this Honorable Court enter an order:

A. Certifying this action as a Class action and appointing Plaintiff as Class Representative and her counsel as Class Counsel;

B. Granting equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiff's and Class Members' Sensitive Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiff and Class Members;

C. Granting equitable relief compelling Defendant to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety, and to disclose with specificity the type of Sensitive Information compromised during the Data Breach;

D. Granting equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

E. Requiring Defendant to pay for not less than three years of credit monitoring services for Plaintiff and the Class;

F. Awarding actual damages, compensatory damages, statutory damages, and statutory penalties, in an amount to be determined, as allowable by law;

G. Awarding punitive damages, as allowable by law;

H. Awarding attorneys' fees and costs under the common fund doctrine, and any other applicable law;

I. Awarding costs and any other expense, including expert witness fees, incurred by Plaintiff in connection with this action;

J. Awarding pre- and post-judgment interest on any amounts awarded; and

K. All such other and further relief as this court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury on all issues so triable.

DATED: February 19, 2026

______________________________
Nicholas J. Mauro AT0005007
CARNEY & APPLEBY LAW FIRM
400 Homestead Building
303 Locust Street
Des Moines, IA 50309
515-282-6803
515-282-4700 (fax)
mauro@carneyappleby.com

David S. Almeida*
Britany A. Kabakov*
ALMEIDA LAW GROUP LLC
849 W. Webster Ave.
Chicago, Illinois 60614
(708) 437-6476
david@almeidalawgroup.com
*Attorneys for Plaintiffs*

* Pro hac vice to be filed